UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

___

MICHAEL WEST,

                        Plaintiff,

vs.                                          DECISION AND ORDER

MICHAEL J. ASTRUE, Commissioner            12-CV-6017-CJS
of Social Security,

                        Defendant.

___

**APPEARANCES**

For Plaintiff:                       William J. McDonald, Jr., Esq.
                                      Bond and McDonald
                                      91 Genesee Street
                                      Geneva, NY 14456
                                      (315) 789-8480

For the Commissioner:          Kathryn L. Smith, A.U.S.A.
                                      U.S. Attorney's Office
                                      100 State Street, Fifth Floor
                                      Rochester, NY 14614
                                      (585) 263-6760

**INTRODUCTION**

**Siragusa, J.** Plaintiff Michael West ("West"), brings this action pursuant to the Social Security Act,[1] claiming that the Commissioner of Social Security ("Commissioner") improperly denied his application for disability and supplemental income security benefits for the period from March 1, 2008, to present. Specifically, West alleges that the decision of an Administrative Law Judge ("ALJ") was erroneous and not supported

---

[1] Codified in relevant parts at 42 U.S.C. § 401 *et seq.* and 42 U.S.C. § 1381 *et seq.*

by substantial evidence contained in the record, or was contrary to law.

The Commissioner moves for judgment on the pleadings, contending that substantial evidence in the record supports the decision to deny benefits. Motion for Judgment on the Pleadings, Jun. 28, 2012, ECF No. 5. West has separately moved for judgment on the pleadings. Motion for Judgment on the Pleadings, Aug. 30, 2012, ECF No. 8. For the reasons described below, the Commissioner's decision is reversed and this case is remanded for a rehearing.

## PROCEDURAL BACKGROUND

On March 4, 2010, West filed an application for Supplemental Security Income benefits, which was denied on May 12, 2010. His application was also considered an application for disability benefits under the Commissioner's Program Operations Manual System (POMS GN 00204.027(A)). West requested a hearing and his request was granted. He had a hearing before ALJ Mary Joan McNamara of Baltimore, Maryland, via teleconference from Rochester, New York, on June 15, 2011. The ALJ issued a decision dated August 12, 2011, denying his application.

On December 9, 2011, the Appeals Council denied West's appeal, making the ALJ's decision the final decision of the Commissioner. On January 9, 2012, West filed an action with this Court pursuant to 42 U.S.C. § 405(g) with this Court.

## STANDARDS OF LAW

### *Jurisdiction and Scope of Review*

Section 405(g) of Title 42, U.S. Code, grants jurisdiction to district courts to hear claims based on the denial of Social Security benefits. Additionally, the section directs that when considering such a claim, the Court must accept the findings of fact made by

the Commissioner, provided that such findings are supported by substantial evidence in the record. Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v NLRB*, 305 U.S. 197, 229 (1938). Section 405(g) thus limits the Court's scope of review to determining whether the Commissioner's findings were supported by substantial evidence. *See, Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (holding that the reviewing court does not try a benefits case *de novo*). The Court is also authorized to review the legal standards employed by the Commissioner in evaluating a plaintiff's claim. The Court must "scrutinize the record in its entirety to determine the reasonableness of the decision reached." *Lynn v. Schweiker*, 565 F. Supp. 265, 267 (S.D. Tex. 1983) (citation omitted).

*Five-step sequential analysis*

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. ' 423(d)(1)(A); *Schaal*, 134 F.3d 496, 501 (2d Cir. 1998).

> The SSA has promulgated administrative regulations for determining when a claimant meets this definition. First, the SSA considers whether the claimant is currently engaged in substantial gainful employment. If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities. If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations. If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled. If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work. Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to

the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501 (citations omitted).

# DISCUSSION

## *Treating Physician Rule*

West contends that the ALJ did not adhere to the treating physician rule when she gave little or no weight to the conclusions of psychiatrist Xingjia Cui, M.D. Under the Commissioner's regulations, a treating physician's opinion is entitled to controlling weight, provided that it is well-supported in the record:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 416.927(d)(2); 20 C.F.R. § 404.1527(d)(2). However, "[w]hen other substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (citing 20 C.F.R. § 404.1527(d)(4)). Nevertheless,

> [a]n ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion. 20 C.F.R. § 404.1527(d)(2). Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion. *Id.* The regulations also specify that the Commissioner 'will always give good reasons in [her] notice of determination or decision for the weight [she] give[s] [claimant's] treating

source's opinion.' *Id.*; *accord* 20 C.F.R. § 416.927(d)(2); *see also Schaal*, 134 F.3d at 503-504 (stating that the Commissioner must provide a claimant with "good reasons" for the lack of weight attributed to a treating physician's opinion).

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).

Additionally, Social Security Ruling 96-2p: Policy Interpreting Ruling Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions, states in relevant part:

> **PURPOSE:** To explain terms used in our regulations on evaluating medical opinions concerning when treating source medical opinions are entitled to controlling weight, and to clarify how the policy is applied. In particular, to emphasize that:
>
> 1. A case cannot be decided in reliance on a medical opinion without some reasonable support for the opinion.
>
> 2. Controlling weight may be given only in appropriate circumstances to medical opinions, *i.e.*, opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources.
>
> 3. Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.
>
> 4. Even if a treating source's medical opinion is well-supported, controlling weight may not be given to the opinion unless it also is "not inconsistent" with the other substantial evidence in the case record.
>
> 5. The judgment whether a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record requires an understanding of the clinical signs and laboratory findings and what they signify.
>
> 6. If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; *i.e.*, it must be adopted.
>
> 7. A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator.

In her decision, the ALJ indicated:

> I give great weight to Dr. Cui's assessment[2] of a GAF[3] score (65), which indicates the claimant had only mild symptoms of social psychological stressors in the "mild" range at that time. (Ex. 13F:14).
>
> I give little weight, however, both to (1) the decision by Dr. Cui to reduce [West's] GAF score to 45 three months later and (2) the vague and internally inconsistent medical source statement submitted by Dr. Cui on June 13, 2011. (Ex. 15F). The change in the GAF score does not find support in the decision to maintain him on the same dose of Effexor and to schedule his next follow-up for six (6) months later. With regard to the medical source statement, Dr. Cui did not explain his belief that the claimant's depression precluded the completion of work at all times after March 2008, even though the treatment relationship did not begin until 2010. Of equal note, Dr. Cui did not attempt to explain the inconsistencies in his medical source statement with regard to the ability to maintain attention for the completion of simple work. I add that it is impossible to ignore the understandable connection between the claimant's increasing depression and the initial adjustment to hepatitis C treatment. (Ex. 17F:7–8). Over time, the claimant's depression should be expected to improve.

R. 33–34. Relying on the treating physician rule discussed above, West disputes these conclusions by the ALJ and maintains that Dr. Cui's June 13, 2011, "Evaluation of the Residual Functional Capacity of the Mentally Impaired Patient," Ex. 15F, R. 579, should have led the ALJ to find him disabled. More specifically, West maintains that Dr. Cui's evaluation,

> represents his opinion regarding Mr. West's ability to perform in fourteen separate areas of intellectual functioning. These include the abilities to understand, carry out and remember simple instructions, and to respond

---

[2] The ALJ was referring to Dr. Cui's February 10, 2011, Progress Notes. R. 555.

[3] "GAF [Global Assessment of Functioning] is a scale that indicates the clinician's overall opinion of an individual's psychological, social, and occupational functioning. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 376-77 (4th ed., text revision, 2000) ('DSM-IV-TR'). The GAF scale ranges from 0 to 100; GAF scores from 61-70 indicate some mild symptoms or some difficulty in social, occupational, or school situations, but general functioning and the existence of some meaningful personal relationships. DSM-IV-TR at 34. GAF scores between 51-60 indicate that the individual has moderate symptoms or moderate difficulty in social, occupational, or school situations. DSM-IV-TR at 34." *Petrie v. Astrue*, 412 Fed. Appx. 401, 406 n.2 (2d Cir. 2011).

> appropriately to supervision, coworkers and usual work situations. These are precisely the areas which the ALJ is required to consider in evaluating mental residual functional capacity.

West Mem. of Law 9–10. The June 13, 2011, form on which Dr. Cui reported West's mental residual functional capacity, which was created by West's counsel, R. 56, included the following instructions: "Please answer the following questions by checking the appropriate rating *and providing comments*." R. 579 (emphasis added). Dr. Cui checked answers (unlimited, good, fair, or poor), but did not make any comments on the sixteen questions for which he checked an answer. In his June assessment, Dr. Chi concluded that: (1) West's ability to function independently on a job was poor; (2) his ability to concentrate and attend to a task over an eight hour period was poor; and (3) his ability to tolerate customary work pressures in a work setting was poor. R. 580. He further concluded that West's impairments were likely to produce good and bad days. *Id.*

Previously, in his Progress Notes of November 8, 2010, Dr. Cui diagnosed West with depressive disorder, not otherwise specified, polysubstance abuse, and assessed a GAF score of 45. R. 559.

Then, in his February 10, 2011, Progress Notes, Dr. Cui reported that West had been "doing quite well," was happy to have ended his relationship with his girlfriend, was "[p]leasant, cooperative, a little bit sluggish," and he was "alert, well oriented x3" with "insight and judgment…both fine." R. 555. Dr. Cui further indicated that plaintiff was "quite stable" with mild depression and could function well and was future oriented. *Id.* At that time, Dr. Cui's diagnois remained, "[d]epressive disorder not otherwise speci-

fied, polysubstance abuse," but, he assessed a GAF score of 65. *Id.* Dr. Cui cleared West for interferon treatment for hepatitis C, concluded he was stable and would be continued on his then-current medication with a "[p]syche followup in 3 months." R. 555.

Next, Dr. Cui's May 27, 2011, Progress Notes reported that West was "a little bit sluggish, and there [is] slight psychomotor retardation," his speech "is soft and slow," and his mood was "'depressed'" with a flat affect. Dr. Cui noted that his thought process was linear, thought content unremarkable, that West denied any auditory or visual hallucinations, and had not suicidal or homicidal ideation. Dr. Chi noted that West "is alert, well oriented x3. His insight and judgment are both limited." However, as of May 27, 2011, Dr. Cui assessed West's GAF score to be 45, continuing him on his medication, with "[n]o dose change for now." R. 596.[4]

Finally, Dr. Cui's June 13, 2011, Evaluation listed West's ability to comprehend and carry out simple instructions as "good," and described as "fair" his ability to remember work procedures, remember detailed instructions, ability to respond appropriately to supervision and co-workers, complete a normal workday on a sustained basis, exercise appropriate judgment, abide by occupational rules, make simple work-related decisions, maintain social functioning, be aware of normal hazards and make necessary adjustments to avoid them. R. 579–81. He listed West's ability to function independently on a job, concentrate and attend to a task over an eight-hour period, and ability to tolerate customary work pressures including production requirements and de-

---

[4] The Court notes that the venlafaxine dosage was 37.5 mg twice a day for depression in the progress notes for February 10, 2011, R. 555, but was 75 mg twice a day for depression in the progress notes for May 27, 2011. R. 596. The May 27 progress notes do not indicate the dosage change date.

mands all as "poor." Dr. Cui also checked "yes," to the question of whether West's condition was likely to deteriorate if he is placed under stress, especially of a job, but marked as "no," the question of whether West had experienced such deterioration in the past. Dr. Cui checked "yes" to the question of whether West was likely to have "good days" and "bad days." R. 582. However, Dr. Cui only put in a "?" symbol on the question asking, "[i]f yes, please estimate, on average, how many days per month your patient is likely to be absent from work as a result of the impairments or treatment…." R. 582.

On June 24, 2011, West was examined by psychiatrist Ahmad Bilal, M.D. R. 594–95. Dr. Bilal noted that West was "somewhat depressed and upset." He also noted that West had "[s]ome restriction of affect. Regular rate and rhythm of speech, linear, goal directed. No delusion or hallucination or suicidal or homicidal ideation." R. 594. Dr. Bilal diagnosed West with "Depression, NOS." Dr. Bilal assessed a GAF score of 60. Dr. Bilal advised West to obtain "a form from the Department of Social Services so that the writer can fill it out to support patient's unemployability, otherwise return to clinic in 3 months." R. 595. Dr. Bilal's notes do not explain how he assessed a GAF Score of 60.

GAF Score assessment is dependent on subjectivity of the rater. *See* Guidelines for Rating Global Assessment of Functioning (GAF), Ann. Gen. Psychiatry (Jan. 20, 2011) (*available at* U.S. National Library of Medicine, National Institutes of Health web site http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3036670/); *see also* Department of Veterans Affairs, Best Practice Manual for Posttraumatic Stress Disorder (PTSD) Compensation and Pension Examination, 9 ("The existing GAF literature shows that in

the absence of systematic training with the GAF, reliability is generally poor.").

The Commissioner, in arguing that the ALJ properly applied the treating physician rule, directs the Court to the discrepancies between earlier medical evaluations by Dr. Cui and other medical sources, and Dr. Cui's June 13th assessment. Comm'r Mem. of Law 21–22. The Commissioner essentially maintains that such inconsistencies provided the ALJ with a sufficient basis to reject Dr. Cui's June 13, 2011, assessment. Starting with the earlier assessments by other medical providers, the Commissioner argues that prior to the relevant period for this case,

> [d]octors reported that plaintiff denied suicidal/homicidal ideations, was pleasant, and his thoughts were clear (Tr. 281). During the relevant period, treatment notes showed that plaintiff was alert, fully oriented, he related adequately, and his attention, concentration and memory skills were intact (Tr. 303). His insight and judgment were fair and his general fund of information was appropriate to experience.

*Id.* 21.

The Court, like the ALJ, is troubled by the changing GAF Scores that have no apparent link to "well-supported…medically acceptable clinical and laboratory diagnostic techniques." SSR 96-2p. In a case such as this, the ALJ was required to attempt to contact Dr. Cui to clarify the medical record. *See Algarin v. Barnhart*, No. 06-CV-6064, 2007 U.S. Dist. LEXIS 35887, *23 (W.D.N.Y. Jan. 25, 2007) ("if the ALJ had doubts or questions about the fibromyalgia diagnosis, he should have attempted, in the first instance, to develop the record further by seeking clarification from Nemetz and Cass."); *see also* SSR 96-5p ("Requirements for Recontacting Treating Sources—Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and

the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion."). Therefore, since Dr. Cui's medical evidence is important, and because the ALJ and the Court have questions concerning his reports, the Court must reverse the ALJ's decision and remand the case for compliance with the requirements of SSR 96-5p "Requirements for Recontacting Treating Sources."

***Other Medical Opinions of Record***

West contends that the ALJ failed to apply the correct legal standards in evaluating the other medical evidence in the Record. In particular, he complains that the ALJ rejected Dr. Linda Stark-McLean's opinion out of hand. R. 33 ("I give no weight to an examining physician's opinion in June 2010 that the claimant 'would not appear to be able to sustain employment given his mental illness.'"). The ALJ wrote that Dr. Starck-McLean was not a mental health expert and based her conclusion on two visits, an offhand observation about West, and West's own subjective complaints about social discomfort. Though these are proper issues to consider in evaluating a medical source statement, the Court is concerned that the ALJ has not correctly complied with Second Circuit case law. *See Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003) ("The fact that Dr. Helfand also relied on Green-Younger's subjective complaints hardly undermines his opinion as to her functional limitations, as '[a] patient's report of complaints, or history, is an essential diagnostic tool.' *Flanery v. Chater*, 112 F.3d 346, 350 (8th Cir. 1997)."). Nevertheless, the Court observes that Dr. Starck-McLean's progress notes for the June 17, 2010, physical examination contain only these conclusions as to

West's mental status: "The patient would appear not to be able to sustain employment given his mental illness. The patient told me he does not like to be around people." R. 561. The only other information she related with regard to West's mental health was to repeat what he told her and what she read in notes—that "the psychiatrist [no name given in the notes] does not feel he should be working," and "patient has a form from social services…and he shows me the form. Per these notes the patient has bipolar illness." R. 560. Accordingly, the Court finds that the ALJ correctly applied the law to determine the weight to be given to Dr. Starck-McLean's assessment of West's ability to work and his mental status.

West also argues that the ALJ failed to identify the weight she gave to A. Hochberg's[5] Medical Residual Functional Capacity Assessment of May 14, 2010. R. 319–21. If A. Hochberg is, indeed, a medical source, his report does not indicate that, and West has not identified where that information is in the Record. The ALJ wrote that she agreed with Hochberg's assessment that West's "impairment imposes a moderate limitation in at least one of the first three (3) broad functional areas set out in the disability regulations. (Ex. 5F)." R. 27. Since Hochberg's credentials are not identified in the Record, the Court is unable to find error with the ALJ's assessment of his conclusions.

West next argues that the ALJ substituted her own personal opinion for that of the medical experts. As this Court has previously written,

---

[5] The ALJ refers to A. Hochberg, whose first name and title do not appear on the form, as a "State agency psychological consultant," R. 26–27, and West's memorandum of law refers to him as "Dr. Hochberg," West Mem. of Law 15.

it is well settled that

> the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion. While an ALJ is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who submitted an opinion to or testified before him.

*Brown v. Barnhart*, 418 F. Supp. 2d 252, 261–62 (W.D.N.Y. 2005) (quoting *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (citation and internal quotations omitted)). As one of several examples, West cites to the fact that "[t]he ALJ rejected Dr. Finnity's finding that Mr. West has difficulty relating with others because of his 'cooperative mood and normal behavior at the independent evaluation.' (Tr. 32 ¶3)." Pl.'s Mem. of Law at 17. West contends that "[t]he ALJ apparently concluded that expert assessments of severe limitations in intellectual functioning are somehow inconsistent with observations of courtesy, a cooperative attitude, good eye contact and neutral mood." *Id.* at 18. The Court agrees that the ALJ improperly substituted her own opinion for that of the medical experts, as evidenced, for example, by her conclusion that, "the claimant's cooperative mood and normal behavior at the independent evaluation did not evince a 'difficulty relating with others.' (Exs. 4F:3, 6F)." R. at 32.

### *The ALJ's Findings Regarding West's Subjective Complaints*

The Commissioner contends that the ALJ correctly assessed West's subjective complaints and found them not to be credible. Comm'r Mem. of Law at 23. The Commissioner refers to the ALJ's decision in which she stated, "[t]he evidence or record—including the nonmedical evidence relating to the credibility criteria set forth at 20 CFR 416.929(c)(3) and SSR 96-7p—does not fully support his testimony with regard to

the frequency and intensity of his symptoms however." R. at 30. In his regulation entitled, "How we evaluate symptoms, including pain," the Commissioner states in pertinent part as follows:

> We will consider all of your statements about your symptoms, such as pain, and any description you, your treating source or nontreating source, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work (or, if you are a child, your functioning). However, statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled. In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings and statements about how your symptoms affect you. (Section 416.927 explains how we consider opinions of your treating source and other medical opinions on the existence and severity of your symptoms, such as pain.) We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work (or if you are a child, your functioning).

20 C.F.R. § 416.929(a). Likewise, in SSR 96-7p, the Commissioner states that, "[u]nder the regulations, an individual's statement(s) about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled."

Since the Court has already determined that the ALJ did not properly apply requirements of SSR 96-5p "Requirements for Recontacting Treating Sources," and since the ALJ's statement, quoted above, includes both the medical evidence as well as

West's subjective complaints, it will be necessary for the ALJ to reassess all the evidence in light of any responses received from Dr. Cui, including her determination of whether West's subjective complaints are credible in light of the medical evidence.

*Mental Residual Functional Capacity*

West contends that the ALJ failed to make a final determination of his mental residual functional capacity. Pl.'s Mem. of Law at 20. The ALJ determined that West suffered from a moderate limitation in "social functioning." R. at 28. West argues that the ALJ, "failed to make any of the detailed mental RFC findings the Commissioner requires. Omitted, for example, is a more detailed statement of the moderate limitation in social functioning she assessed at step 3 of the sequential evaluation." Pl.'s Mem. of Law at 21. SSR 96-8p discusses the ALJ's obligations in reviewing a claimant's psychological limitations:

> *The psychiatric review technique.* The psychiatric review technique described in 20 CFR 404.1520a and 416.920a and summarized on the Psychiatric Review Technique Form (PRTF) requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF.

SSR 96-8p. Here, the ALJ explained the basis of her determination that West suffers from a moderate limitation in "social functioning," but did not make any specific findings of how that moderate limitation would affect his potential to perform work. Instead, she

appears to have simply concluded at the end of her assessment that West did not suffer from at least two marked limitations, or a marked limitation and repeated episodes of decompensation, each of extended duration. R. at 29. The ALJ did acknowledge that, "[t]he mental residual functional capacity assessments used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR-96-8p)." R. at 29. Nevertheless, the ALJ's further assessment under steps four and five did not provide an analysis of how his moderate limitation in "social functioning" might, or might not, limit his ability to perform work. Therefore, when reassessing the medical evidence after this remand, the ALJ should also address the specific requirements of SSR 96-8p.

*Vocational Expert*

West also maintains that the testimony of the vocational expert was inadequate since the hypothetical question did not adequately reflect his limitations. Pl.'s Mem. of Law at 22. As this Court has concluded,

> A vocational expert's testimony is only useful if it addresses whether the particular claimant, with his limitations and capabilities, can realistically perform a particular job. *Parker v. Harris*, 626 F.2d 225, 231 (2d. Cir. 1980). Hypothetical questions constructed to assist a vocational expert in determining whether there are any employment possibilities for a claimant are defective where they do not account for his actual limitations. *Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d. Cir. 1981); *see also Gilliam v. Califano*, 620 F.2d 691, 693-694 (8th Cir. 1980). Vocational testimony elicited by hypothetical questions that fail to relate with precision to the physical and mental impairments of a claimant is not substantial evidence on which an ALJ may base a decision. *Bradley v. Bowen*, 800 F.2d 760, 763 (8th Cir. 1986).

*Mathews v. Barnhart*, 220 F. Supp. 2d 171, 175 (W.D.N.Y. 2002). West argues that the

question the ALJ posed to the vocational expert did not include conclusions from three medial sources. Specifically, West contends that the ALJ incorrectly left out Dr. Cui's determination that he, "has no useful ability to function independently on a job, concentrate and attend to a task over an eight-hour period or tolerate customary work pressures in a work setting including production requirements and demands." Pl.'s Mem. of Law at 22–23. Further, West contends that the ALJ failed to include Dr. Finnerty's observation that he "has difficulty with attention and concentration and maintaining a regular schedule as well as difficulty relating with others and dealing with stress," and Dr. Hochberg's conclusion that West, "has moderate limitations in twelve separate areas of intellectual functioning." *Id.* at 22. Since the Court has already determined that the ALJ failed to comply with SSR 96-5p, and remands for compliance with that ruling, upon any rehearing, the ALJ should also reassess whether, in light of any evidence obtained as a result of recontacting treating sources, the questions posed to the vocational expert comply with the requirements detailed above.

## CONCLUSION

For the reasons set forth above, the Court grants in part, and denies in part, each of the two motions for judgment on the pleadings. The Commissioner's decision is reversed pursuant to sentence four of 42 U.S.C. § 405(g), to the Commissioner for further proceedings consistent with this Decision and Order.

IT IS SO ORDERED.

Dated:  September 10, 2013
         Rochester, New York        /s/ Charles J. Siragusa
                                             CHARLES J. SIRAGUSA
                                             United States District Judge